UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| TRISTAN J. HOUGH and TREVIN A. HOUGH, by and through their Guardian and Parent, RAYNE ABBOTT; DANIEL J. MANTHEY; EMILY TROSETH; and DAVID MORAVEC, | Case No. 07-CV-2508 (PJS/RLE) |
| Plaintiffs, | |
| v. | |
| SHAKOPEE PUBLIC SCHOOLS (INDEPENDENT SCHOOL DISTRICT NO. 720); SHAKOPEE BOARD OF EDUCATION; KATHY MCKAY, Director of Special Education for Shakopee Public Schools, in her individual capacity; MINNESOTA RIVER VALLEY SPECIAL EDUCATION COOPERATIVE (JOINT POWERS SCHOOL DISTRICT NO. 993); LEZLIE PRETTYMAN OLSON, Director, in her individual capacity; DARREN KERMES, Director, in his individual capacity; COLLEEN TROSEN, Special Education Coordinator, in her individual capacity; and BARBARA BAHNSON, Special Education Administrator, in her individual capacity, | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MOTION FOR SEPARATE TRIALS |
| Defendants. | |

Margaret O'Sullivan Kane, KANE EDUCATION LAW, LLC, for plaintiffs.

Amy E. Mace, RATWIK ROSZAK & MALONEY, for defendants Shakopee Public Schools, Shakopee Board of Education, and Kathy McKay.

Timothy J. O'Connor, LIND JENSEN SULLIVAN & PETERSON, PA, for defendants Minnesota River Valley Special Education Cooperative, Lezlie Prettyman Olson, Darren Kermes, Colleen Trosen, and Barbara Bahnson.

Plaintiffs were enrolled in special-education programs operated by defendant Minnesota River Valley Special Education Cooperative ("MRVSEC"). Defendant Shakopee Public Schools ("Shakopee") is one of six school districts that belong to MRVSEC.[1] Shakopee often refers its students with special needs to programs run by MRVSEC. Three of the five plaintiffs in this action were referred by Shakopee to MRVSEC; the other two plaintiffs were referred by districts that are not parties to this action.

The MRVSEC programs attended by plaintiffs differed in many respects, but they had one thing in common: Every student was searched every day when he or she arrived at school. Generally speaking, students had their backpacks and purses searched, and students were required to empty their pockets, remove their shoes and socks, turn down the waistband of their pants, and sometimes to submit to a patdown search.

This is essentially a Fourth Amendment case, but plaintiffs have filed a "kitchen-sink" complaint, in which they allege not only that the searches violated the Fourth Amendment, but also that the searches violated numerous other provisions of the United States Constitution, the Minnesota Constitution, federal statutes, Minnesota statutes, and the common law. Plaintiffs contend that the searches violated their rights under the Fourteenth Amendment to procedural due process, substantive due process, and equal protection of the laws. Plaintiffs raise due-process claims under the Minnesota Constitution. Plaintiffs contend that the searches amounted to disability discrimination in violation of Title II of the Americans with Disabilities Act

---

[1]Shakopee's public-school system is Independent School District No. 720. Defendant Shakopee Board of Education is the group of elected officials who run Shakopee's public-school system. Although plaintiffs name both Shakopee Public Schools and the Shakopee Board of Education as defendants in their complaint, plaintiffs' claims against these two entities are identical. The Court therefore generally refers to both entities together as "Shakopee."

("ADA"), 42 U.S.C. § 12132, the Rehabilitation Act, 29 U.S.C. § 794 (known as "§ 504" of the

Act), and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.12 subd. 1.  And

plaintiffs bring tort claims under Minnesota law for intrusion upon seclusion (a type of invasion

of privacy).[2]

The parties cross-move for summary judgment, and Shakopee moves for a separate trial if

its motion for summary judgment is denied.  For the reasons that follow, the Court grants

summary judgment to all defendants on all of plaintiffs' claims, with two exceptions:  First, the

Court grants summary judgment to plaintiffs on their Fourth Amendment claim against

MRVSEC.  Second, the Court denies summary judgment both to plaintiffs and to the MRVSEC

defendants on the claims of Trevin Hough and Daniel Manthey for intrusion upon seclusion.  The

Court also denies as moot Shakopee's motion for a separate trial.

## I.  BACKGROUND

MRVSEC is a school district established under Minnesota's Joint Powers Statute, Minn.

Stat. § 123A.15, to serve students who need special education.  For the sake of convenience, the

Court will sometimes refer to these as "disabled" students or as students with "special needs."

MRVSEC enrolls students from each of its six member districts:  Shakopee, Belle Plaine, Jordan,

New Prague, Prior Lake-Savage, and Montgomery-Lonsdale.  Kermes Aff. ¶ 2 [Docket No. 144].

MRVSEC's governing board is made up of one representative from each of these six districts.

---

[2]Plaintiffs' initial complaint also raised claims with respect to plaintiff Tristan Hough for violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-50.  Those claims were severed on the Court's own motion under Rule 21(b) of the Federal Rules of Civil Procedure.  Order Mar. 14, 2008 [Docket No. 78].  The Court also dismissed various claims pursuant to the parties' stipulation.  *Id.* at 6-7; Stip. of Dism. [Docket No. 76].  The operative complaint in this matter is the Second Amended Complaint, filed September 16, 2008 [Docket No. 181].

Individual defendants Lezlie Prettyman Olson, Darren Kermes, Colleen Trosen, and Barbara Bahnson are all former or current officials of MRVSEC.  Individual defendant Kathy McKay is the Director of Special Services (including special-education services) for the Shakopee school district.

MRVSEC operates programs at several different locations.  Within a particular program, MRVSEC may group students according to their age or their needs into what are effectively sub-programs.  Four MRVSEC programs are at issue in this case:  the New Prague Education Center ("New Prague"), the Oasis program, the River Valley Education Center ("River Valley"), and the Town Square Education Center ("Town Square").  Within River Valley, there is both a junior high and a senior high, as well as a program for students with pervasive developmental disorders ("PDD").  Within Town Square, there are programs called "Crossings I," "Crossings II," "Potentials," "Journeys," and "Pathways."  Town Square serves high-school-age students and, overall, is a "transition program" aimed at preparing its students to live independently.  Town Square is located in a shopping mall.[3]

All of these programs are designated as "Setting IV" programs under federal law. Bahnson Aff. ¶ 17 [Docket No. 143].  Setting IV programs are non-residential public schools that exclusively serve disabled students.  *Id.* ¶ 12.

---

[3]The record does not appear to include evidence about searches at MRVSEC's PLUS program (attended for one year by Tristan Hough).  The Court therefore does not deem plaintiffs to be challenging the search policy of the PLUS program.  The Court also does not deem plaintiffs to be challenging the search policy of Carver-Scott Educational Cooperative, an entity that is not a part of this suit and that both Daniel Manthey and Trevin Hough attended for periods of time.

The parties generally agree that plaintiffs were searched at the beginning of every school day when they attended New Prague, Oasis, River Valley, and Town Square.  These searches have been conducted at Town Square since 2001 and at the other programs since 1998.[4]  The searches are discussed in detail below, in connection with plaintiffs' Fourth Amendment claims.

Plaintiffs Daniel Manthey, Tristan Hough, and Trevin Hough, who lived in the Shakopee school district at the time of the events underlying this suit, are suing Shakopee and MRVSEC and associated individual defendants.[5]  Plaintiffs Emily Troseth[6] and David Moravec, who lived outside of the Shakopee school district, are suing only MRVSEC and the MRVSEC-associated individual defendants.  The Court summarizes below the basic facts about each plaintiff.[7]  To avoid confusion, the Court refers to plaintiffs by their first names (as do the parties).

---

[4]Bahnson Aff. ¶ 3 ("The 'Code of Conduct' at issue has been used by MRVSEC since 1998.  Searches at the Town Square Transition Center began in 2001."), ¶ 6 ("In the past 10 years since the searches at issue were initiated, there have been no objections by students or parents to the search policy.").

[5]According to the Second Amended Complaint, the claims of Tristan and Trevin Hough are being brought "by and through their Guardian and Parent, Rayne Abbott . . . ."  Second Am. Compl. at 1.  Abbott has no claims of her own, and the Court therefore refers to Tristan and Trevin as plaintiffs.

[6]The caption of the Second Amended Complaint erroneously lists "Emily Trosen" as a plaintiff.  Second Am. Compl. at 1.  Emily's last name is "Troseth."  ("Trosen" is the last name of one of the defendants.)

[7]Except as otherwise indicated, the facts about plaintiffs are taken from the joint stipulation of facts filed by the parties at the Court's request.  Stip. of Facts [Docket No. 185].  The Court appreciates the parties' assistance in clarifying the facts.

*A. Daniel*

Daniel began attending junior high at River Valley in December 2003, when he was fourteen years old.  He attended River Valley for the rest of the 2003–2004 school year, except for a short period in May 2004 when he attended the Carver-Scott Educational Cooperative.  In the fall of 2004, Daniel was incarcerated at the Hastings Juvenile Services Center.  After he was released, he attended senior high half-time at River Valley and half-time at Shakopee Senior High from December 2004 through December 2005.  Daniel then attended Shakopee Senior High full-time from January 2006 through March 2007, and attended programs at Carver-Scott Educational Cooperative thereafter.  In total, then, Daniel attended River Valley programs for about two years, from December 2003 to December 2005.  Daniel turned eighteen in January 2007.

An assessment of Daniel's special-education needs conducted in January 2003 found that he was eligible for special-education services based on an "Other Health Disability."  O'Connor Aff. [Docket No. 129] Ex. 8 at MRV00093.  Specifically, the assessment concluded that Daniel suffered dysthymia (a type of chronic depression) and attention-deficit hyperactivity disorder ("ADHD").  *Id.* at MRV00092.  Further, the assessment said that Daniel showed "a pattern of emotional or behavioral responses that are of significant concern to his mother and school staff" and that his "inability to manage his behavior in the school setting is greatly impacting his success . . . ."  *Id.* at MRV00093.  According to the evaluation, when he was in the eighth grade, Daniel had "several serious behavior problems" such as "refusal to cooperate, verbal abuse, disruptive behavior, pulling fire alarm with a false 911 call, pushing, shoving, scuffling and physical assault."  *Id.* at MRV00081.

Subsequent individual education plans ("IEPs") based on the January 2003 evaluation identified Daniel's primary disability as "Emotional/Behavior Disorder." Mace Aff. [Docket No. 122] Ex. 24 at 1 (IEP dated December 2003); Mace Aff. Ex. 26 at MRV00052 (IEP dated December 2004); Mace Aff. Ex. 25 at 1 (IEP dated May 2004). An IEP dated November 17, 2005 and based on an evaluation prepared the same day identified Daniel's primary disability as "Other Health Disabilities." Mace Aff. Ex. 27 at 1.

At the beginning of the ninth grade, before he enrolled in MRVSEC, Daniel was expelled from two different schools. First, Daniel was expelled from Shakopee Junior High after he brought a pocketknife to school. O'Connor Aff. Ex. 3 ("Daniel Dep.") at 13-15. He was then expelled from the Carver-Scott Educational Cooperative after less than two weeks for threatening to kill a fellow student. *Id.* at 23-24, 148. The police were called because of the threat, and Daniel was charged in juvenile court. *Id.* at 24-25. Daniel has also been convicted as a juvenile for assaulting or threatening family members. *Id.* at 39-40.

While at River Valley, Daniel was once found with a lighter in his pocket. *Id.* at 66. The police were called to River Valley roughly five to ten times on Daniel's account. *Id.* at 80-81, 85-86. When he was at Shakopee High School, the police were called once because of an alleged threat made by Daniel. Daniel denied having threatened anyone, but he was convicted in juvenile court. *Id.* at 111-12.[8]

---

[8]In its summary-judgment brief, MRVSEC bases its narrative about Daniel on hearsay from various police reports and incident reports. MRVSEC Mem. Supp. Mot. S.J. at 4-6 [Docket No. 124]. Some of this hearsay might (or might not) be admissible under an exception to the hearsay rule, but MRVSEC has not even tried to establish the admissibility of the hearsay evidence on which it relies. The Court has therefore ignored the various police reports and incident reports cited by MRVSEC.

*B.  Tristan*

Tristan participated in MRVSEC's PLUS program at an ordinary middle school for most of the 1997–1998 school year, when he was twelve years old.  Toward the end of that school year (in April 1998), Tristan began attending the PDD program at River Valley.  He remained in that program throughout the next two school years (1998–1999 and 1999–2000).  Tristan began splitting his time between the River Valley PDD program and Town Square in October 2000, when he was fifteen.  For most of the 2000–2001 school year, he attended the River Valley PDD program from Monday to Thursday and attended MRVSEC's "Crossings" program on Fridays.[9] Toward the end of that school year (in April 2001), Tristan started attending the Crossings program full-time.  For the next four school years (that is, through April 2005), Tristan was enrolled in Town Square or in the Crossings program.  In April 2005, Tristan attended New Prague.

Overall, Tristan was enrolled in a challenged MRVSEC program for roughly seven years, from April 1998 through April 2005. Tristan turned eighteen in June 2003, and he received his high-school diploma in June 2008.

According to an IEP prepared in May 2003 and based on an evaluation from February 2001, Tristan's primary disability was autism-spectrum disorder.  O'Connor Aff. Ex. 10 at MRV01540.  A subsequent IEP prepared in September 2004 and based on an evaluation from March 2004 listed Tristan's primary disability as "Emotional/Behavior Disorder."  O'Connor

---

[9]The record is unclear as to whether the "Crossings" program was always at Town Square.  It makes no practical difference, however, because it is undisputed that students in the "Crossings" program were subject to the challenged searches, whether the program was located at Town Square or elsewhere.

Aff. Ex. 34 at MRV01828.  And an IEP prepared in March 2006 and also based on the March 2004 evaluation listed Tristan's primary disability as autism-spectrum disorder and his secondary disability as "Specific Learning Disability."  Kane Aff. [Docket No. 172] Ex. 16 at 1. Tristan's mother is his legal guardian.

While Tristan was at Town Square, the Shakopee police were called to the school roughly twenty times on Tristan's account.  O'Connor Aff. Ex. 9 ("Tristan Dep.") at 63-68.  According to Tristan, these police calls were unjustified.  *Id.* at 69 ("I haven't given them any reason [to call the police], no."), 82 ("I've never given [the police] a reason to even show up at the school for me.").  Tristan has never been arrested, *id.* at 100, although he was hospitalized at least once because of concerns that he was a danger to himself, *id.* at 68-69.

Tristan was suspended from Town Square five or more times.  *Id.* at 119.  On one occasion, Tristan was suspended for bringing to school a Leatherman multi-tool (a type of tool with an integrated knife, pliers, and screwdrivers, among other things).  *Id.* at 134-35.  On another occasion, he was suspended after he gave his fanny pack to a teacher for safekeeping and a search of the fanny pack turned up an arrowhead and nunchaku.  *Id.* at 136–38.

### C.  Trevin

Trevin, Tristan's younger brother, attended middle school and high school at New Prague from 1999 through May 2003.  Trevin enrolled in the Town Square "Potentials" program at the start of the 2003–2004 school year, when he was sixteen, and attended Town Square for three years, through April 2006.  Trevin transferred to a program at the Carver-Scott Education Cooperative in May 2006 and attended that program until June 2008, when he graduated from the program at age twenty.

According to a school-registration form dated September 2003, Trevin was

developmentally delayed and learning disabled, as well as having attention-deficit hyperactivity

disorder and panic attacks.  Mace Aff. Ex. 5 at 1.  IEPs dated January 2004 and January 2005,

both of which were based on an evaluation from April 2002, identified Trevin's primary

disability as "Emotional/Behavior Disorder."  O'Connor Aff. Ex. 12 at MRV00454; O'Connor

Aff. Ex. 37 at MRV00219.  A subsequent IEP dated June 2005, based on an evaluation from May

2005, identified Trevin's primary disability as mild to moderate developmental cognitive delay.

Mace Aff. Ex. 12 at 1.

While attending Town Square, Trevin was suspended at least once, in January 2005, for

possessing a marijuana pipe.  O'Connor Aff. Ex. 11 ("Trevin Dep.") at 12-13; Kane Aff. [Docket

No. 152] Ex. 12.  The pipe was discovered when Trevin was searched by Town Square staff at

the beginning of the school day.  Trevin Dep. at 15.  Town Square staff called the police when

they found the pipe, and Trevin was cited for possession of drug paraphernalia in violation of

Minn. Stat. § 152.092.  Kane Aff. [Docket No. 152] Ex. 12 at 3.  On three or more occasions,

Town Square staff discovered marijuana on Trevin's person in the course of the routine searches.

Trevin Dep. at 20-21.  On one of these occasions, Town Square staff called the Shakopee police,

who issued a citation to Trevin for possession of a small amount of marijuana.  Kane Aff.

[Docket No. 152] Ex. 13.

### D.  Emily

Emily attended MRVSEC's "Oasis" program beginning in April 1999, when she was

thirteen, through December 2000.  Emily then transferred to New Prague, which she attended for

a year and a half, through the end of the 2001–2002 school year.  For the next three school years,

from August 2002 through May 2005, Emily was enrolled in the "Pathways" program at Town

Square.  She graduated from the program in May 2005, at age nineteen.

According to a neuropsychological evaluation completed in October 2000, Emily

exhibited "difficulty sustaining attention, disinhibition, impulsivity, and mood instability."

O'Connor Aff. Ex. 14 at MRV01098.  The evaluator diagnosed her as having pervasive

developmental disorder and said that she would "require more structure and external direction

than others her age due to her executive functioning deficits and her resulting difficulty self-

directing and self-monitoring."  *Id.* at MRV01099.  According to an IEP dated January 2004 and

based on an evaluation from June 2002, Emily's primary disability was "Emotional/Behavior

Disorder."  O'Connor Aff. Ex. 15 at MRV00868.

## E.  David

David was enrolled in the "Crossings II" program at Town Square for the 2004–2005

school year.  At the end of that year, when he was twenty, David graduated from the program.

David suffers from static encephelopathy and has speech problems as a result.  O'Connor Aff.

Ex. 18 at MRV02390-91.  According to an IEP dated February 2005, David's primary disability

was "Physical Impairment."  O'Connor Aff. Ex. 36.

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over

a fact is "material" only if its resolution might affect the outcome of the suit under the governing

substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a

fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for

either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In

considering a motion for summary judgment, a court "must view the evidence and the inferences

that may be reasonably drawn from the evidence in the light most favorable to the non-moving

party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B. Fourth Amendment

Plaintiffs bring suit under 42 U.S.C. § 1983, contending that their Fourth Amendment

rights were violated when they were subjected to daily searches at school.[10] Because different

defendants raise different defenses, the Court first considers the claims against MRVSEC, then

the claims against Shakopee, and finally the claims against the individual defendants.[11] Before

addressing the specific claims, though, the Court first summarizes the relevant law governing

school searches.

---

[10]Plaintiffs assert, in the Second Amended Complaint, a Fourth Amendment claim in Count 1 and a separate claim for "violations of 42 U.S.C. § 1983" in Count 3. But it is black-letter law that "one cannot go into court and claim a 'violation of § 1983' — for § 1983, by itself, does not protect anyone against anything." *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). The Court construes plaintiffs to raise in Count 1 a claim under § 1983 for the violation of their Fourth Amendment rights. Count 3, standing alone, fails to state a claim, and is dismissed for that reason.

[11]Although plaintiffs' initial complaint included official-capacity claims against some individual defendants, the Second Amended Complaint asserts only individual-capacity claims against the individual defendants.

1.  The Constitutionality of School Searches

The Supreme Court held in *New Jersey v. T.L.O.* that the Fourth Amendment's "prohibition on unreasonable searches and seizures applies to searches conducted by public school officials."  469 U.S. 325, 333 (1985).  Whether a school search is lawful under the Fourth Amendment "depend[s] simply on the reasonableness, under all the circumstances, of the search."  *Id.* at 341.  School searches can be based on something less than probable cause to believe that a crime has been committed or is underway.  *Id.*

*T.L.O.* held that the constitutionality of school searches, like the constitutionality of any search, should be assessed in two steps.  *Id.*  At the first step, the court asks whether the search was "justified at its inception"; at the second step, the court asks whether the search was "reasonably related in scope to the circumstances which justified the interference in the first place."  *Id.* (quotations omitted).  With respect to school searches in particular, *T.L.O.* said:

> Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school.  Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341-42.

*T.L.O.* expressly reserved the question whether and under what circumstances students could be searched in the absence of individualized suspicion of wrongdoing.  *Id.* at 342 n.8.  Since *T.L.O.,* the Supreme Court has established that school searches do not always need to be supported by individualized suspicion.  Instead, suspicionless searches can be justified by

-13-

"special needs, beyond the normal need for law enforcement . . . ." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (quotations omitted).

In *Vernonia School District*, the Court upheld a school district's policy of subjecting student athletes to random, suspicionless drug tests.  In holding the policy constitutionally permissible, the Court found that the student athletes had a diminished expectation of privacy. *Id.* at 657 ("[S]tudents who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy.").  The Court further found that the challenged drug tests were not particularly invasive because the students provided urine samples in private, the samples were tested only for drugs, and the test results were "not turned over to law enforcement authorities or used for any internal disciplinary function." *Id.* at 658; *see also id.* at 658 n.2 ("the search here is undertaken for prophylactic and distinctly nonpunitive purposes").  And the Court found that the school's interest in deterring student drug use was "important — indeed, perhaps compelling . . . ." *Id.* at 661.  In addition, the Court pointed out that the drug-testing policy was directed "narrowly to drug use by student athletes, where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high." *Id.* at 662.  Finally, the Court found that the policy "effectively addressed" the problem of drug use by student athletes "by making sure that athletes do not use drugs." *Id.* at 663.  Given these findings about the school's drug-testing policy, the problem addressed by the policy, and the students' expectations of privacy, the Court held that the challenged drug test was constitutionally permissible because it was a search "that a reasonable guardian and tutor might undertake." *Id.* at 665.

More recently, the Supreme Court held that schools may conduct random, suspicionless drug tests not only of student athletes (as in *Vernonia School District*) but also of any student who participates in competitive extracurricular activities (such as, for instance, Future Farmers of America, choir, and band), provided that the student's participation in such activities is conditioned on his consent to such drug testing. *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawotomie County v. Earls*, 536 U.S. 822 (2002). In reaching this conclusion, the Court weighed the degree of the invasion of students' privacy by the drug tests against the significance of the need for the drug-testing policy.

*Earls* reaffirmed that "[a] student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety." *Id.* at 830. *Earls* also rejected any distinction, for drug-testing purposes, between competitive, non-athletic extracurricular activities and athletics, noting that "students who participate in competitive extracurricular activities voluntarily subject themselves to many of the same intrusions on their privacy as do athletes." *Id.* at 831. *Earls* noted that competitive, non-athletic extracurricular activities were subject to state regulation, and held that such regulation "further diminishes the expectation of privacy among schoolchildren." *Id.* at 832.

Further, *Earls* relied on the "limited uses to which the test results are put" in finding that the tests did not significantly burden the students' privacy. *Id.* at 834. *Earls* noted that the test results were "kept in confidential files separate from a student's other educational records and released to school personnel only on a 'need to know' basis." *Id.* at 833. *Earls* also observed that the test results were "not turned over to any law enforcement authority" and did not "lead to the imposition of discipline or have any academic consequences." *Id.*

-15-

With respect to the need for the drug-testing policy, *Earls* found that "the nationwide drug epidemic makes the war against drugs a pressing concern in every school." *Id.* at 834. More specifically, *Earls* observed that the school district "presented specific evidence of drug use" in its schools. *Id.* But *Earls* rejected the argument that the school district was required to show "a particularized or pervasive drug problem" to justify the challenged drug-testing policy. *Id.* at 835. Rather, *Earls* held that "the nationwide epidemic of drug use" together with "evidence of increased drug use" in the district's schools was a sufficient basis for the policy. *Id.* at 836. *Earls* also found that "the safety interest furthered by drug testing is undoubtedly substantial for all children, athletes and nonathletes alike." *Id.* Based on all these factors, *Earls* found the challenged drug-testing policy to be "a reasonable means of furthering the School District's important interest in preventing and deterring drug use among its schoolchildren" and thus to comport with the Fourth Amendment. *Id.* at 838.

*Vernonia School District* and *Earls*, taken together, provide guidance for assessing the constitutionality of a school's drug-testing policy. But the searches in *Vernonia School District* and *Earls* were far removed from the searches conducted by MRVSEC. In *Vernonia School District* and *Earls*, students were required to urinate into a specimen cup in private; their backpacks and purses were not searched, they did not have to empty their pockets, they did not have to remove any clothing, no one looked inside the clothing they kept on, and they were not patted down.

In *Doe v. Little Rock School District*, 380 F.3d 349 (8th Cir. 2004), the Eighth Circuit considered the constitutionality of school searches that were somewhat closer to the searches conducted by MRVSEC. *Doe* involved a challenge to a school district's policy of conducting

random, suspicionless searches of students' belongings.  380 F.3d at 351.  Specifically, the

school district would select a classroom at random and instruct the students in that room to empty

their pockets and place all of their belongings, including backpacks and purses, on their desks.

*Id.*  Students were then instructed to leave the room.  *Id.*  With the students absent, school

personnel would search the belongings; the searches included "rummaging through personal

belongings concealed within" the backpacks and purses.  *Id.* at 355.  At no time were the students

themselves searched.[12]

        In holding that the search policy violated the Fourth Amendment, the Eighth Circuit

conducted the balancing test called for in *Vernonia School District* and *Earls* and weighed three

factors: (1) the scope of the students' legitimate expectation of privacy; (2) the nature of the

intrusion; and (3) the need for, and the effectiveness of, the intrusion in furthering the

government interest at stake.  *Id.* at 352.  *Doe* held:  "Because subjecting students to full-scale,

suspicionless searches eliminates virtually all of their privacy in their belongings, and there is no

evidence in the record of special circumstances that would justify so considerable an intrusion,

we hold that the search practice is unconstitutional."  *Id.* at 352-53.

        In reaching this conclusion, *Doe* acknowledged that all students have a diminished

expectation of privacy, and that some subgroups of students (such as student athletes) voluntarily

give up additional privacy in exchange for the right to participate in certain activities.  *Id.* at 353-

54.  But the entire student body was subject to the challenged searches, and thus *Doe* rejected the

---

        [12]The first paragraph of *Doe* says that the case presents the question whether a school
district's practice of "random, suspicionless searches of [students'] *persons* and belongings by
school officials is unconstitutional."  380 F.3d at 351 (emphasis added).  In the balance of the
opinion, however, *Doe* describes only searches of students' belongings, not of their persons.

argument that the students had "made a voluntary tradeoff of some of their privacy interests in exchange for a benefit or privilege." *Id.* at 354. *Doe* also rejected the school board's argument that the students' expectation of privacy was diminished by a passage in the student handbook which described the school's search policy and which said that students' belongings could be searched at any time. *Id.*

*Doe* then held that the challenged searches "invade[] students' privacy interests in a major way." *Id.* at 354. *Doe* said that the students' "privacy interests . . . in the personal belongings that they bring to school are wholly obliterated by the search practice at issue here . . . ." *Id.* at 355. *Doe* contrasted the challenged searches — which it characterized as "highly intrusive" — with "minimally intrusive" and "constitutionally reasonable" administrative searches using dogs or metal detectors. *Id.* *Doe* also noted that because any contraband turned up during the searches was regularly turned over to law-enforcement officials and used in criminal proceedings, the intrusion on students' privacy was "qualitatively more severe than that in *Vernonia* and *Earls*." *Id.*

*Doe* also found that the school district had no evidence of "any significant and immediate difficulties sufficient to give rise to a special need for such an unprecedented practice" — that is, the practice of random, suspicionless searches of students' belongings. *Id.* at 356. The district instead offered only "generalized concerns about the existence of weapons and drugs in its schools," without providing evidence about "the magnitude of any problems with weapons or drugs that it has actually experienced." *Id.* *Doe* held that such generalized evidence was not enough. Rather, to justify the challenged random, suspicionless searches, the school was required to make "a specific showing . . . that not engaging in the searches would have

jeopardized some important governmental interest." *Id.* at 356.  Put another way, because the

school's search policy effectively reduced the students' privacy interests "to nothing," the school

was required to show "unique circumstances that would justify significant intrusions" on those

privacy interests.  *Id.* at 356-57.  The district's "mere assertion that there are substantial problems

associated with drugs and weapons in its schools" was insufficient to establish the requisite

"unique circumstances," and the search policy was therefore unconstitutional.  *Id.* at 357.

### 2.  MRVSEC

Although they quibble over some details, the parties generally agree that plaintiffs were

routinely searched at the beginning of every school day when they were enrolled in the New

Prague, Oasis, River Valley, and Town Square programs.  MRVSEC contends that these routine

searches were consistent with the Fourth Amendment.  After closely examining the record and

the three *Doe* factors, the Court disagrees.

### a.  Scope of the Legitimate Expectation of Privacy

The expectation of privacy of any student "is limited in a public school environment

where the State is responsible for maintaining discipline, health, and safety."  *Earls*, 536 U.S. at

830.  MRVSEC argues that the expectation of privacy of a student who needs special education

is even more limited than the expectation of privacy of a student who does not.  MRVSEC Mem.

Supp. Mot. S.J. ("MRVSEC SJ Mem.") at 16-17 [Docket No. 124].  MRVSEC points out, for

example, that disabled students must disclose substantial personal information, including

information about their medical history, to participate in special-education programs.  As a result,

MRVSEC contends, students with special needs, unlike students without special needs, have

little or no expectation of privacy at school.

The Court disagrees.  Certainly, special-needs students must sacrifice, to a least a limited extent, the privacy of medical and other information about their disabilities.  And some students with special needs may have to sacrifice other privacy interests; for example, a disabled student who needs help going to the bathroom or with personal hygiene would necessarily have a reduced expectation of privacy.  But *all* special-education students do not forfeit *all* expectations of privacy by virtue of being disabled.  Students with disabilities remain members of the human family; they generally have the same expectation of privacy in their bodies, and clothing, and personal possessions as any other student.  The fact that, say, the medical records of an autistic student must be disclosed to a limited number of school officials does not mean that the autistic student somehow gives up his bodily integrity.

MRVSEC argues that even if forfeiting privacy is not inherent in being a student with special needs, such a student somehow "waives" his right to privacy when he chooses to accept special-education services from a school district.  But participating in a special-education program is very different from participating in athletics (as in *Vernonia School District*) or in competitive extracurricular activities (as in *Earls*).  No student is entitled under the law to play football or sing in the choir, but every disabled student is entitled under the law to special-education services.  Moreover, because school attendance is compulsory, a student's participation in a special-education program is not voluntary in the same way that participation in extracurricular activities is voluntary.  MRVSEC "cannot reasonably claim that those subject to search have made a voluntary tradeoff of some of their privacy interests in exchange for a benefit or privilege."  *Doe*, 380 F.3d at 354.

The Court also rejects MRVSEC's argument that its codes of conduct — which inform students that they may be searched — diminish the students' expectations of privacy.[13]   The Eighth Circuit quickly dispatched this argument in *Doe*:  "[MRVSEC] may not deprive its students of privacy expectations protected by the fourth amendment simply by announcing that the expectations will no longer be honored."  *Id.*

MRVSEC seems to argue, though, that special-needs students waive any expectation of privacy when they sign a form acknowledging that they have received the code of conduct and agree to abide by it.  The Court disagrees.  To begin with, the Court has grave doubts that an acknowledgment signed by a disabled minor has any legal effect whatsoever.  Even if the Court's doubts are not well-founded, MRVSEC has provided acknowledgment forms for only some of the plaintiffs and for only some of the relevant time periods.[14]  More important, MRVSEC has

---

[13]The Town Square code of conduct for 2004–2005 provides:  "All students may be searched when they enter the building.  Students may be asked to turn out their pockets and staff may also search bags and clothing."  Kane Aff. [Docket No. 131] Ex. 1 at MRV01818.  The December and September 2000 codes of conduct for River Valley, New Prague, and the Oasis program are more definite.  They provide:  "All students may be searched when they enter the building.  Students may be asked to turn out their pockets and staff will search bags and clothing."  *Id.* at MRV00033 (River Valley Senior High); *id.* at MRV00029 (River Valley Junior High); *id.* at MRV00025 (River Valley Crossings); *id.* at MRV00017 (New Prague); *id.* at MRV00021 (Oasis).

Interestingly, a search policy adopted by MRVSEC in 2007 for MRVSEC as a whole is much more limited.  It provides:  "The personal possessions of students and/or a student's person may be searched when school officials have a reasonable suspicion that the search will uncover a violation of law or school rules.  The search will be reasonable in its scope and intrusiveness."  Kane Aff. [Docket No. 131] Ex. 2 at SD-517 to -518.

[14]The record contains no consent form for David.  The record contains a consent form signed in December 2003 by Daniel and his mother in which Daniel promises "to obey all guidelines and rules in accordance with the River Valley Junior High Code of Conduct *while being transported by school and staff automobile*."  O'Connor Aff. Ex. 32 at MRV00122

(continued...)

-21-

not established that it may legitimately condition students' participation in its programs on their

agreement to the search conditions found in the codes of conduct.  As noted above, school

attendance is compulsory, and students have a right to special-education services.  Thus, a

student's consent to a search policy like MRVSEC's is illusory unless the student has a genuine

alternative — that is, unless the student has a choice of at least two special-education programs

of relatively equal quality and accessibility, one of which has a search condition, and one of

which does not.

_____

[14](...continued)
(emphasis added).  This consent form relates only to Daniel's conduct "while riding in the above said automobile."  *Id.*

With respect to Town Square, the record contains "Code of Conduct" acknowledgment forms signed by Trevin, Emily, and Tristan.  By signing the form, the student affirms that he or she "understand[s] and agree[s] to follow the expectations" of the program.  *See, e.g.*, O'Connor Aff. Ex. 33 at MRV00786.  But the forms do not cover the entire relevant time period for any of these three plaintiffs, and some forms were signed by plaintiffs alone when they were minors, not by plaintiffs' parents.

Specifically, with respect to Trevin, the record contains one Town Square acknowledgment form signed by him in September 2004, when he was seventeen, and initialed by an unidentified person.  O'Connor Aff. Ex. 31 at MRV00408.  But Trevin started attending Town Square in August 2003, and he attended New Prague before then.  The record does not contain a New Prague acknowledgment form signed by Trevin.

With respect to Emily, the record contains one Town Square acknowledgment form signed by her in August 2004, when she was nineteen.  O'Connor Aff. Ex. 33 at MRV00786.  But Emily started attending Town Square in August 2002 and attended New Prague and the Oasis program before then.  The record does not contain acknowledgment forms from Emily for either of these programs.

Finally, with respect to Tristan, the record contains Town Square acknowledgment forms dated August 2002 and August 2004 and signed by both Tristan and his mother.  O'Connor Aff. Ex. 30 at MRV01503, MRV01822.  But Tristan started attending Town Square part-time in October 2000 and full-time in April 2001.  And he attended River Valley full-time from April 1998 to May 2000, and part-time from October 2000 to April 2001.  The record contains no River Valley acknowledgment forms signed by Tristan.  But the record does contain a New Prague acknowledgment form signed by Tristan and his mother in April 2005, which is the only time that Tristan attended New Prague.  *Id.* at MRV02119.

Although MRVSEC asserted at the summary-judgment hearing that students do have

such a choice, the record contains almost no evidence supporting MRVSEC's assertion.[15]

Indeed, the sparse evidence in the record suggests that similar special-education programs have

search conditions like MRVSEC's.[16]  And even if equivalent programs without search conditions

exist, whether MRVSEC could require students to consent to its search policy as a condition of

enrollment in MRVSEC programs would be a difficult legal question — one that the Court need

not address given the near-total lack of evidence about the quality, accessibility, and search

policies of alternative programs, and given the paucity of evidence about whether plaintiffs ever

in fact gave effective consent to the searches.

In sum, the Court finds that, while the legitimate expectation of privacy retained by

special-education students "falls below the already limited baseline level of privacy afforded to

public school students generally," *Doe*, 380 F.3d at 353-54, special-education students

---

[15]Kermes asserts in his affidavit:  "MRVSEC is one special education option among many available to students who are residents of MRVSEC member districts who qualify for special educational services.  Comparable programs of equivalent quality are always available for students who elect, for whatever reason, not to attend MRVSEC."  Kermes Aff. ¶ 6.  Notably absent from Kermes's affidavit, however, is any assertion about whether those "comparable programs" have a search policy like MRVSEC's.

[16]Bahnson described her research in connection with developing the challenged search policies as follows:

> We visited other separate site programs in the metro area and kind
> of outlying ones, and I went with the team, and we walked through,
> looked at their documentation, saw how they set things up.  We
> discussed then what we thought would be workable and still
> consistent with our philosophy and how we wanted to run the
> building and we took those things.

Bahnson Dep. at 15.  Bahnson said that two special-education programs that she visited in the 1997–1998 school year, Thompson Heights in South St. Paul and Crossroads in St. Francis, were then doing daily searches like the ones challenged in this case.  *Id.* at 27-29.

nevertheless retain some legitimate expectation of privacy in their bodies, clothing, and personal possessions.

### b. Character of the Intrusion

MRVSEC argues that the searches were minimally intrusive because they were "administrative and predictable:  every student was searched before entering the building." MRVSEC SJ Mem. at 19.  MRVSEC also asserts that "the fruits of the search[es] were only used for internal, regulatory purposes and were not turned over to the police."  *Id.* at 18.

MRVSEC dramatically underestimates the intrusiveness of the searches.  Although different witnesses described the searches somewhat differently, MRVSEC concedes that, as a general rule, students were asked to remove their shoes and socks, turn down the waistband of their pants, empty their pockets, and (at least sometimes) submit to a patdown.  MRVSEC SJ Mem. at 19; Bahnson Dep. at 25-26;[17] Trosen Dep. at 33-36;[18] *see also* Daniel Dep. at 64-65.[19]

---

[17]The cited excerpts from Bahnson's deposition are attached to the first Kane Affidavit [Docket No. 131] as a labeled, unnumbered exhibit.

[18]At her deposition, Trosen and plaintiffs' counsel had the following exchange about the searches at the Town Square programs:

> Q:     What you're saying is children were asked to turn things over; is that correct?
>
> A:     Yes.
>
> Q:     And that was the extent of it?   Pockets weren't turned inside out?   Shoes and socks weren't taken off?   Bags weren't opened and looked into?
>
> A:     No.   All of those things happened.   I think I said bags were looked into, but, you know, every day I don't think it was the exact search or the exact same person, but shoes were not always taken off.   Pockets, kids always sort of just automatically, if they had a coat with 16 pockets on it, we

(continued...)

Further, one of MRVSEC's own witnesses, Barbara Bahnson, testified that students must pull up

their pant legs if they are wearing baggy pants, and that students' backpacks and purses are

_____

[18](...continued)
might just take their coat off and let you just feel the coat. But pulling the pockets out was just a pretty routine thing for the students. Or they would say, I don't have anything in my pockets today. But on a daily basis in terms of physically, anybody physically patting somebody down, that wasn't a regular thing.

Q:    But it did happen?

A:    Oh, yes.

Q:    And this happened to all the children that came into the program?

A:    Yes.

Trosen Dep. at 35-36. The cited excerpts from Trosen's deposition are attached to the first Kane Affidavit [Docket No. 131] as a labeled, unnumbered exhibit.

[19]Daniel and MRVSEC's counsel had the following exchange at Daniel's deposition:

Q:    Can you describe [the search]?

A:    I guess you could say he'd pat you down or whatever and make you turn your pockets inside out. If you were wearing like a sweatshirt or whatever, he'd check your hood, and he'd check the pocket that sits in front. He'd make you take off your shoes or whatever, and you'd pound them on the ground so if there was anything in there, I guess it would fall out or whatever. But yeah, he would pat you down or whatever and search us that way.

      . . .

Q:    The teacher would put hands on you?

A:    Yes.

Q:    And what would they pat down?

A:    Arms and legs. And then they would take your waistline where your pants are, and they would like shake it or whatever.

Daniel Dep. at 64-65.

searched if the students want to bring them into class.  Bahnson Dep. at 25-26.  Other MRVSEC

witnesses testified that backpacks and purses are *routinely* searched.  Olson Dep. at 60;[20] Trosen

Dep. at 33 ("The staff may open the purse and look in the purse or open a backpack.").

In addition, MRVSEC distorts the record when it says that the results of the searches

were not shared with the police.  As a matter of policy, MRVSEC's codes of conduct for the

New Prague, Oasis, River Valley, and Town Square programs expressly *require* that drugs or

weapons found during a search be turned over to the police.[21]  And as a matter of practice,

plaintiffs have provided evidence that on at least two occasions, drugs or drug paraphernalia

found by the school during searches of Trevin were turned over to the police, who issued

citations to Trevin for breaking the law.  Kane Aff. [Docket No. 152] Exs. 12-13; Trevin Dep.

at 13-14.  Finally, MRVSEC's witnesses confirmed that all drugs, and some weapons, found

---

[20]The cited excerpts from Olson's deposition are attached to the first Kane Affidavit
[Docket No. 131] as an unnumbered exhibit labeled "LPO Depo."

[21]According to the Town Square code of conduct for 2004–2005, if a student brings a
weapon to school, "[p]arents will be notified and depending on the circumstances, legal action
may be taken."  Kane Aff. [Docket No. 131] Ex. 1 at MRV01819.  And with respect to alcohol or
drugs, "[i]f a student is found to be in possession or suspected possession of alcohol or drugs, the
items will be confiscated, [and] law enforcement *will* be notified along with parents."
*Id.* at MRV01820 (emphasis added).

The River Valley Senior High code of conduct dated December 2000 uses somewhat
stronger language.  It provides that if a student brings a weapon to school, "[p]arents will be
notified and depending on the circumstances, consequences in the program and legal action *will*
be taken."  *Id.* at MRV00034 (emphasis added).  With respect to drugs, the code of conduct
provides:  "If a student is found to be in possession or suspected to be in possession of alcohol or
drugs, the items will be confiscated and parents will be notified.  Law enforcement *will* be
notified."  *Id.* (emphasis added).  The codes of conduct for several other MRVSEC programs
dated September 2000 have similar provisions.  *Id.* at MRV00030 (River Valley Junior High);
MRV00026 (River Valley Crossings program); MRV00022 (River Valley Oasis program);
MRV00018 (New Prague Education Center).

during a search would be turned over to the police.  Bahnson Dep. at 26 ("If [something found during a search] was illegal like it was drugs or a knife or something, we would call parents.  We would call the police."); Trosen Dep. at 39 ("My next step [if I found marijuana during a search] would be to call the police liaison.").

An otherwise valid administrative search — for instance, a search for weapons with a metal detector — will not necessarily become invalid just because the results of the search are turned over to the police.  *See New York v. Burger*, 482 U.S. 691, 717 (1987) (holding that an otherwise valid administrative search "is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals" for crimes uncovered during the search but unrelated to the reason for the search); *C.N.H. v. Florida*, 927 So. 2d 1, 3 (Fla. Ct. App. 2006) (citing *Burger*).  But, as in *Doe*, defendants' policy of turning contraband over to the police increases the intrusiveness of the challenged searches.

On the whole, MRVSEC's searches were extraordinarily intrusive.  As in *Doe*, the students' backpacks and purses, and the contents of their pockets, were searched.  *Doe* found such searches to be "highly intrusive" and characterized them as "wholly obliterating" the students' "privacy interests . . . in the personal belongings that they bring to school."  *Id.* at 355.  But whereas *Doe* involved occasional searches of the possessions of randomly selected students, MRVSEC searched the possessions of every student every day.  Thus, even if MRVSEC had stopped at searching possessions, its searches would have been far more intrusive than the "highly intrusive" searches struck down in *Doe*.[22]

---

[22]MRVSEC's curious argument that being searched every day is less intrusive then being searched at random once in a while defies common sense.

But MRVSEC did not stop at searching *possessions*.  MRVSEC searched *people*.  The students not only had their backpacks, purses, and the contents of their pockets searched, but students were required to partially disrobe (i.e., to take off their shoes and socks, and sometimes coats, sweaters, or sweatshirts) and to permit school employees to look inside their clothes (i.e., under their waistbands and pant legs).  And, most importantly, the students were *touched*.  Every day, every student either was patted down or was at least subject to being patted down.

MRVSEC's searches were as intrusive as any government search that any American citizen is likely to experience in her lifetime, unless she is incarcerated.  Anyone who has been thoroughly searched at an airport — who has had her arms, legs, chest, and back touched by a stranger, and then had her most personal possessions pawed through — knows exactly how intrusive such a search is.  The MRVSEC searches were even more intrusive, and every student experienced them every day.

In sum, the Court concludes that the MRVSEC searches were extraordinarily intrusive — far more intrusive than the searches approved in *Vernonia School District* and *Earls*, and far more intrusive than the searches disapproved in *Doe*.  In none of those cases did school officials, without individualized suspicion, force students to take off clothing, look inside of students' clothing, or touch students.  Indeed, with the exception of one case (discussed below) involving students who had committed crimes and were attending what was essentially a correctional facility, defendants have not cited a single case in which a court approved suspicionless searches of students that were nearly as intrusive as MRVSEC's.

*c. Nature and Immediacy of the Government Concern*

MRVSEC contends that its searches were justified by compelling government interests. Specifically, MRVSEC contends that its students are "cognitively impaired, emotionally disturbed, and suffer an extensive range of developmental disorders" and therefore "by definition require quiet, controlled, restrictive environments in which the challenges presented by these disorders can be overcome." *Id.* at 21-22.  According to MRVSEC, its searches were conducted "to remove distractions, create a calm and focused learning environment wherein students feel safe, and attempt to teach these students who have been unsuccessful in numerous other education settings." *Id.* at 22.

Although MRVSEC offers little evidence of the fact, the Court is willing to assume that MRVSEC's students do indeed have a special need for a safe and distraction-free environment. But this need cannot — by itself — justify the extremely intrusive searches that are at issue in this case.

No one disputes that MRVSEC can legitimately ban from the classroom things like iPods, cell phones, lighters, cigarettes, and knives — the "dangerous" and "distracting" items that it contends its search policy is directed at.  MRVSEC SJ Mem. at 22.  Thus, MRVSEC can ask its students not to bring such items to school in the first place, or to place them with school staff for safekeeping during the day if students do bring them to school.  Indeed, MRVSEC does just this, and plaintiffs have not challenged MRVSEC's policy requiring that such items be turned over at the schoolhouse door.

If students voluntarily comply with a requirement that they leave dangerous or distracting items at home, or check them with staff, then MRVSEC's stated goal of maintaining a safe,

distraction-free classroom environment will be met.  Accordingly, MRVSEC's search policy can

be justified only to the extent that students cannot be expected to voluntarily comply with the

MRVSEC rules about dangerous and distracting items.

Although MRVSEC has evidence that three of the five plaintiffs have, in fact, brought to

school forbidden items that have been discovered during searches, this evidence is insufficient to

justify an intrusive search of every student every day.  MRVSEC has given the Court no reason

to believe that far less intrusive searches would not adequately ensure compliance with the

guidelines about dangerous and distracting items.  Virtually every item that school officials have

identified as being dangerous or distracting (guns, knives, cell phones, iPods, and lighters), as

well as virtually every dangerous or distracting item that any plaintiff has ever brought to school

(Leatherman multi-tools, nunchaku, and lighters), could be detected with a metal detector.  Such

screening would be far less intrusive than the searches MRVSEC now employs — and, quite

possibly, would be more effective at detecting dangerous or distracting items.  As the Eighth

Circuit has pointed out:  "[D]ogs and magnetometers are often employed in conducting

constitutionally reasonable large-scale 'administrative' searches precisely because they are

minimally intrusive, and provide an effective means for adducing the requisite degree of

individualized suspicion to conduct further, more intrusive searches."  *Doe*, 380 F.3d at 355.

The search policy could be narrowed in other respects.  The policy could be changed so

that illegal items that are found are not required to be turned over to law enforcement.  Students

could be given the option of checking backpacks, purses, and coats with school officials at the

beginning of the day in lieu of having those items searched.  And more thorough searches could

be reserved for students who set off a metal detector or otherwise give school officials some

reason to suspect that they are carrying dangerous or disruptive items.[23]  MRVSEC has submitted

no evidence that these or other less intrusive alternatives would not adequately accomplish the

purposes of the intrusive searches that MRVSEC now employs.

Finally, it is important to note that the distraction-free-classroom rationale advanced by

MRVSEC in this litigation does not appear to have been the actual rationale behind the adoption

of the search policy.  Rather, MRVSEC's witnesses testified that the search policy was adopted,

at least in part, not for educational purposes, but for punitive and public-relations ones.  For

instance, Olson, MRVSEC's former director, testified that she discussed the Town Square code

of conduct with the school board "[b]ecause there were safety concerns related to having it [i.e.,

---

[23]In cases in which school searches for weapons have been upheld against constitutional challenges, schools have generally used stationary or handheld metal detectors to do screening searches, and only searched students physically if the metal detector was activated.  *See, e.g.*, *In re Latasha W.*, 70 Cal. Rptr. 2d 886, 887 (Cal. Ct. App. 1998) ("Students were not touched during the search, and were required to open pockets or jackets only if they triggered the metal detector."); *Florida v. J.A.*, 679 So. 2d 316, 318 (Fla. Ct. App. 1996) ("The students are scanned with the wand by a team member of the same sex.  If the wand indicates the presence of metal the student is asked to remove any object in that area which may be triggering the device.  If the wand again alerts to the presence of metal, the area is patted down.  All coats, bags and other items are also scanned with the wand.  If the wand alerts, the team member looks inside the item for weapons."); *In re S.S.*, 680 A.2d 1172, 1173 (Pa. Super. Ct. 1996) (holding that the Fourth Amendment was not violated by a search in which students were scanned with a metal detector and students' coats and belongings, after being placed on a table, were patted down); *People v. Pruitt*, 662 N.E.2d 540, 547 (Ill. Ct. App. 1996) (in holding that Fourth Amendment was not violated by requiring students to walk through metal detectors, finding that "[t]he intrusion was minimal, not involving any physical touching until the metal detector reacted"); *People v. Dukes*, 580 N.Y.S.2d 850, 851 (N.Y. Crim. Ct. 1992) ("[W]hen a student's bag or parcel activates the scanning device [i.e., a handheld metal detector], the officer is to request the student to open the container in question so that the officer can look for weapons.  If a student's body activates the device, the officer first repeats the request to remove metal objects.  A second scan is then conducted and if the device is activated again, the officer escorts the student to a private area where a more thorough search is conducted.").

the Town Square program] in a mall and how we could help the community feel good about it."
Olson Dep. at 52-53.

With respect to the search policies at the other MRVSEC programs, Bahnson testified
that MRVSEC adopted the policies after learning that similar special-education programs in the
area had similar policies.  Bahnson Dep. at 27-29.  She testified further that, in her opinion, the
school had "reasonable suspicion" to routinely search children in MRVSEC programs based on
"[t]he fact that they're already in an off site [emotional-behavior disorder] program, and that
many of them have in their history brought — the reason they're in the building is because
they've been expelled from their school or brought things to their school."  *Id.* at 34-35.

Implicitly recognizing that this punitive, suspicion-based rationale is inconsistent with
MRVSEC's position in this litigation about the purpose of the searches, Bahnson stated in an
affidavit filed with MRVSEC's summary-judgment papers that "MRVSEC had no policy
requiring that students are to be administratively searched before entering the building only upon
'reasonable suspicion.'"  Bahnson Aff. ¶ 4.  But a party cannot defeat summary judgment with an
affidavit that contradicts earlier sworn testimony.  *Camfield Tires, Inc. v. Michelin Tire Corp.*,
719 F.2d 1361, 1365 (8th Cir. 1983) ("If a party who has been examined at length on deposition
could raise an issue of fact simply by submitting an affidavit contradicting his own earlier
testimony, this would greatly diminish the utility of summary judgment as a procedure for
screening out sham issues of fact."); *see also Sandoval v. Am. Bldg. Maint. Indus.*, 552
F. Supp. 2d 867, 876 n.3 (D. Minn. 2008) (citing *Camfield Tires*).

MRVSEC programs are educational, not punitive.  Bahnson asserts that school districts
"may . . . refer a student with a disability who has had a weapons or drug violation at school to a

MRVSEC level IV program as a less restrictive alternative to a homebound placement," Bahnson

Aff. ¶ 19, but this vague assertion does not transform an educational program into a punitive one.

Indeed, when asked at her deposition how many students were in MRVSEC programs because

they had been expelled from a previous school or had brought a dangerous weapon to school,

Bahnson could not answer.  Bahnson Dep. at 35.  Moreover, the IEPs for plaintiffs do not

indicate that any of them were sent to MRVSEC because of drug or weapons violations at a

previous school.[24]

---

[24]For example:  Tristan's 2003 IEP justified his placement in a setting IV program as
follows:

> Tristan needs a small, predictable setting with few distractions and
> transitions.  He needs a setting that is responsive to his immediate
> needs for problem-solving, behavior, and safety.  Due to his unique
> needs the IEP team feels that a community based setting with
> opportunity to practice skills in applicable environments will best
> meet Tristan's needs at this time.

O'Connor Aff. Ex. 10 at MRV01545.

Trevin's 2004 IEP justified his placement in a setting IV program as follows:

> Trevin needs small group/individual educational instruction for
> functional reading, math, written language, and daily living skills.
> He needs social skills instruction and the chance to practice what
> he has learned in a safe environment. . . .  Trevin is transported in a
> special education van because his school district does not offer the
> type of education he needs.  Trevin needs shortened assignments.
> He also needs more in class time to complete assignments.

O'Connor Aff. Ex. 12 at MRV00464-65.

Emily's 2004 IEP justified her placement in a setting IV program as follows:

> Because of the need for structure, supervision, individualized
> academic support and flexibility, therapeutic support, and
> immediate feedback, the team agrees that the least restrictive
> setting for Emily is a small, nurturing setting.  This environment
> provides a more individualized, confidential, and responsive
> learning program.  The team agrees that support through special

(continued...)

The fact that MRVSEC programs are educational, not punitive, is a crucial distinction between this case and a case on which MRVSEC relies heavily, *C.N.H. v. Florida*, 927 So. 2d 1 (Fla. Ct. App. 2006). *C.N.H.* held that a school's policy of conducting "daily suspicionless pat-down searches of every student every morning" did not violate the Fourth Amendment. *Id.* at 2. But the school in *C.N.H.* was an "alternative school" to which students were sent "before they are actually confined and in lieu of being confined," and "[v]irtually all" of the students were there

_____

[24](...continued)
> education in a general education building would not meet Emily's needs because of the high degree of structure, supervision, individualized instruction, and support needed.

O'Connor Aff. Ex. 15 at MRV00876.

David's 2005 IEP explained his placement as follows:

> David is currently attending [Town Square] Crossings II a transition program. David needs an environment that will allow him to learn the skills necessary to be successful in adulthood. David needs a small group setting.

O'Connor Aff. Ex. 36 at MRV02365.

Only Daniel's placement in a MRVSEC program seems to have been, at least arguably, disciplinary. Daniel's 2004 IEP explains his placement this way:

> The team determined that behavior does interfere with Danny's ability to access general education and impact his educational progress. In developing an educational program, positive, proactive strategies will be put in place to maximize his opportunity to have access to general education curriculum and extra-curricular activities. A school-based program with 4 hours a day of support from special education was not sufficient for Danny to make adequate progress academically or behaviorally. An alternative school was tried but he was removed from there after less than a week for aggressive and unsafe behaviors. A separate site, special education program can provide the support and interventions he needs to be successful. The team agreed that a class at Shakopee High School for one hour a day will be scheduled in the fall of 2004.

O'Connor Aff. Ex. 35 at MRV00047.

by court order and were not eligible to attend ordinary public schools.  *Id.*  The students "were individuals who had already been involved in criminal offenses, and who were receiving a 'last chance' to redeem themselves."  *Id.* at 5.

There is no evidence that MRVSEC students attend its programs in lieu of juvenile detention.  And there is insufficient evidence that MRVSEC students have such significant disciplinary problems that every one of them must be intrusively searched every day as a means of maintaining a safe and distraction-free classroom environment.  Although the Fourth Amendment does not require a school to adopt the least-intrusive means of searching its students, it does require that searches be reasonable.  *See Earls*, 536 U.S. at 837 ("[R]easonableness under the Fourth Amendment does not require employing the least intrusive means . . . .").  MRVSEC's policy of daily, suspicionless searches is not reasonable in light of the evidence offered by MRVSEC in this case, and accordingly it does not pass constitutional muster under *T.L.O.*, *Vernonia School District*, *Earls*, and *Doe.*

### 3.  Shakopee

MRVSEC has violated plaintiffs' Fourth Amendment rights, but it does not necessarily follow that Shakopee has also done so.  Apart from asserting that the challenged searches were lawful — an argument that the Court has already rejected — Shakopee contends that plaintiffs failed to exhaust their remedies, and that Shakopee is not liable for any Fourth Amendment violations because such violations did not result from an official custom or policy of Shakopee. The Court rejects the exhaustion defense, but agrees that Shakopee is entitled to summary judgment because no custom or policy of Shakopee caused the violations of plaintiffs' Fourth Amendment rights.

### a. Exhaustion

Shakopee contends that all of plaintiffs' federal claims, including their claims under § 1983 for violation of the Fourth Amendment, are barred because plaintiffs failed to exhaust their administrative remedies as required by the Individuals with Disabilities Education Act ("IDEA"). Mem. Supp. Shakopee Defs. Mot. S.J. ("Shakopee SJ Mem.") at 9-13 [Docket No. 120]. Section 1983 itself does not, of course, impose an exhaustion requirement. *See Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 515-16 (1982); *see also Porter v. Nussle*, 534 U.S. 516, 523 (2002) (citing *Patsy*). But IDEA requires plaintiffs suing under other federal statutes and seeking "relief that is also available under" IDEA to exhaust the administrative remedies provided in IDEA. 20 U.S.C. § 1415(l). *See, e.g., AP v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, 538 F. Supp. 2d 1125, 1152 (D. Minn. 2008); *S.A.S. v. Hibbing Pub. Schs.*, No. 04-3204 (JRT/RLE), 2005 U.S. Dist. LEXIS 13437, at *6 (D. Minn. July 1, 2005) ("This exhaustion requirement [under the IDEA] also applies if the parent chooses to bring an IDEA type claim under another statute, such as the ADA or Section 504, or the Constitution.").

The Court finds, however, that plaintiffs' claims with respect to the search policy are not IDEA-type claims. Such claims are ones that "relate to a school's failure to provide a free appropriate public education." *AP*, 538 F. Supp. 2d at 1152. It is true that some language in plaintiffs' complaint suggests that they are challenging the quality of their education. For instance, plaintiffs assert that they were subjected to a "hostile and abusive educational environment as a result of the searches and seizures." Second Am. Compl. ¶ 43. But the core of plaintiffs' Fourth Amendment claim is the contention that they were searched unlawfully; plaintiffs' assertions with respect to the effect of the searches on their education are peripheral to

this claim.  Although plaintiffs' complaint is less clear than it might be, and blurs the lines between different types of claims, plaintiffs' Fourth Amendment claim is a typical challenge to a school search policy.  *See, e.g.*, *C.N.H.*, 927 So. 2d 1; *Doe*, 380 F.3d 349; *In re Latasha W.*, 70 Cal. Rptr. 2d 886 (Cal. Ct. App. 1998); *Florida v. J.A.*, 679 So. 2d 316 (Fla. Ct. App. 1996); *In re S.S.*, 680 A.2d 1172 (Pa. Super. Ct. 1996).  The mere fact that plaintiffs are disabled and receive special-education services does not transform their Fourth Amendment challenge into an IDEA-type claim, notwithstanding the imprecise drafting of the complaint.

### b.  Monell *Liability*

Under § 1983, government entities are not vicariously liable for the constitutional violations of their employees.  Rather, a government agency can be held liable under § 1983 only if the plaintiff's injury results from "execution of a government's policy or custom . . . ."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 120-21 (1992) (citing *Monell*).

The challenged searches are conducted by MRVSEC employees pursuant to MRVSEC policies.  Shakopee is one of several school districts with a representative on MRVSEC's board, but Shakopee's participation on that board is not a basis for imputing MRVSEC's policies directly to Shakopee, any more than the participation of, say, Prior Lake-Savage or Montgomery-Lonsdale makes those districts liable to plaintiffs.  Indeed, plaintiffs do not even attempt, in their summary-judgment brief, to explain how Shakopee — as opposed to MRVSEC — is liable under *Monell* for the searches.  Pl. Mem. Supp. Mot. S.J. ("Pl. SJ Mem.") at 13 [Docket No. 128] ("The *MRVSEC Defendants* . . . have admitted that they instituted a custom or policy of conducting daily searches of students with disabilities . . . .") (emphasis added).

In responding to Shakopee's summary-judgment brief, plaintiffs suggest that Shakopee's liability under *Monell* arises from its failure to "take[] any action to investigate the search policy and procedure at the MRVSEC segregated facilities where the Shakopee Defendants continue to refer special needs students."  Pl. Mem. Opp. Shakopee Defs. Mot. S.J. ("Pl. Shakopee SJ Opp.") at 12-13 [Docket No. 155].  Thus, it appears that plaintiffs seek to hold Shakopee liable for its failure to investigate MRVSEC's search policy — as if MRVSEC's policy would have become Shakopee's once Shakopee was on notice of it.[25]

Whether and to what extent Shakopee knew about MRVSEC's search policy is unclear. *Compare* Shakopee SJ Mem. at 1819 *with* Pl. Shakopee SJ Opp. at 2-3.  But even if Shakopee knew of the search policy, the Court is not persuaded that such knowledge would mean that Shakopee *itself* had adopted a policy or custom that caused plaintiffs' injuries.  The unlawful searches were carried out by MRVSEC employees pursuant to MRVSEC policies, and Shakopee controls neither MRVSEC nor its employees.  Plaintiffs have not pointed to a single case in which an entity like Shakopee has been found liable under § 1983 for the actions of a separate entity that it participates in but does not control.  The Court is unwilling to extend § 1983 liability so far.

---

[25]In discussing Shakopee's liability under *Monell*, plaintiffs assert in their brief opposing summary judgment:  "Appellees have admitted that they instituted a custom or policy of depriving disabled students of the accommodation and related services of transportation when such children were ineligible to receive ESY services."  Pl. Shakopee SJ Opp. at 12.  Apparently plaintiffs' counsel recycled material from an appellate brief in an unrelated case for this section of her brief.  This is further evidence that plaintiffs do not have a serious argument that a custom or policy of Shakopee's supports a § 1983 claim against it.

4.  Individual Defendants

Both Shakopee and MRVSEC argue that their employees are not liable in their individual capacity for any Fourth Amendment violations because the employees are entitled to qualified immunity.  The Court agrees.  Because qualified immunity defeats plaintiffs' claims against the individual defendants, the Court need not address the individual defendants' other arguments.

Qualified immunity shields government agents from liability as long as the agents' actions are objectively reasonable in light of clearly established legal principles.  *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part*, *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).  Put another way, a government agent is entitled to qualified immunity unless the right that he violated was "so clearly established at the time that a reasonable official would have understood that his conduct was unlawful under the circumstances[.]"  *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007).

As discussed above, the undisputed facts establish that MRVSEC violated plaintiffs' Fourth Amendment right to be free of unreasonable searches.  But the Court does not believe that the law with respect to school searches was so unequivocal that the searches were objectively unreasonable in light of clearly established legal principles.

Under *Doe*, suspicionless searches like those challenged in this case are plainly unconstitutional in the ordinary school setting.  But MRVSEC programs are not ordinary school settings; they serve only special-education students, and those students receive services that are not provided — or are provided to only a small minority of students — in ordinary schools.  In *C.N.H. v. Florida*, discussed above, suspicionless searches like those challenged in this case were upheld in the context of an "alternative school" for students who would otherwise have been

-39-

confined.  927 So. 2d at 2.  While the Court finds *C.N.H.* distinguishable, *C.N.H.* does provide

some support for plaintiffs' position that the challenged MRVSEC searches were constitutional.

Under the circumstances of this case, it was not objectively unreasonable — although it was

incorrect — for defendants to conclude that sufficient special circumstances existed to justify

MRVSEC's search policy under the Fourth Amendment.

### C.  The Fourteenth Amendment's Due Process Clause[26]

#### 1.  Procedural Due Process

The Due Process Clause of the Fourteenth Amendment forbids states to "deprive any

person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV,

§ 1.  To prevail on their procedural due-process claim, plaintiffs must establish two things.  First,

they must show that they were deprived of a life, liberty, or property interest protected by the

Fourteenth Amendment.  Second, they must show that the state deprived them of that interest

without providing adequate process.  *See Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 902

(8th Cir. 2000).

Although plaintiffs use the language of procedural due process in their complaint and

their briefs, plaintiffs have not given any indication of how their *procedural* rights — as opposed

to their *substantive* right to be free of unreasonable searches — were violated.  As MRVSEC

points out, plaintiffs have not identified any process that they were deprived of and that they

---

[26]In Count Two of their complaint, plaintiffs allege a claim for violation of their due-process rights under the Minnesota Constitution.  The Shakopee defendants properly point out that there is no private right of action under the Minnesota Constitution.  Shakopee SJ Mem. at 44; *Guite v. Wright*, 976 F. Supp. 866, 871 (D. Minn. 1997).  Plaintiffs did not bother to respond to this argument, nor did plaintiffs voluntarily dismiss this claim, despite being urged by the Court to pare down their complaint.  The Court dismisses plaintiffs' claims under the Minnesota Constitution.

wanted MRVSEC to provide before searching them.  *See* MRVSEC SJ Mem. at 24.  Plaintiffs

respond to this argument by asserting merely that they were not afforded any "procedural

avenue . . . to challenge the suspicionless searches."  Pl. Mem. Opp. MRVSEC Defs. Mot. S.J.

("Pl. MRVSEC SJ Opp.") at 11 [Docket No. 150].

Plaintiffs' entire case, however, proceeds from the premise that the searches should not

have been conducted *at all*.  Plaintiffs do not contend that the searches might have been

permissible if MRVSEC had followed a particular procedure with respect to each student before

searching him or her, nor do they request a procedural remedy.  Instead, plaintiffs ask the Court

to "[d]eclare that Defendants' actions deprived the plaintiffs of their right to be free from

warrantless, suspicionless, unreasonable search[es] and seizures in violation of the Fourth and

Fourteenth Amendments to the United States Constitution."  Second Am. Compl. § VI (Prayer

for Relief) ¶ 3.[27]

The Eighth Circuit held that a procedural due-process claim did not have to be submitted

to the jury when the plaintiff "offered no evidence or argument at any point during the trial

describing what procedural protections were available or should have been used" in connection

with an alleged deprivation of their right under the Fourteenth Amendment to procedural due

process.  *Vaughn v. Ruoff*, 304 F.3d 793, 795 (8th Cir. 2002).  The underlying principle of

*Vaughn* applies in this case:  A plaintiff who seeks only to stop a challenged practice entirely,

---

[27]In their complaint, plaintiffs also asked the Court to enjoin defendants from conducting
"further warrantless, suspicionless, unreasonable search[es] and seizures without probable cause
of all students with disabilities attending in any and all special education programs within the
Defendants' schools[.]"  Second Am. Compl. § VI (Prayer for Relief) ¶ 1.  Plaintiffs have since
acknowledged that because they are no longer eligible to attend MRVSEC programs, they are not
entitled to injunctive relief.  Pl. MRVSEC SJ Opp. at 27.

rather than to be afforded procedural protections in connection with that practice, does not have a procedural due-process claim.[28]  Thus, the Court finds that plaintiffs have not stated a claim for violation of their procedural due-process rights.

## 2.  Substantive Due Process

As noted above, plaintiffs' due-process claims rest on the contention that the challenged searches were unconstitutional.  But this contention cannot support a substantive due-process claim under § 1983 and the Fourteenth Amendment.

To begin with, it is black-letter law that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).  Because plaintiffs' claims are essentially claims for Fourth Amendment violations, plaintiffs cannot also bring substantive due-process claims for the same conduct.  MRVSEC made this very argument in its summary-

---

[28]*See Zinermon v. Burch*, 494 U.S. 113, 126 (1990) (holding, with respect to procedural due-process claims, that "to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law."); *see also Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999) (describing elements of procedural due process claim as including allegation that the state "did not afford [plaintiffs] adequate procedural rights prior to depriving them of their protected interest"); *Wudtke v. Davel*, 128 F.3d 1057, 1062-63 (7th Cir. 1997) ("While it can be difficult at times to distinguish a procedural due process claim from one that is substantive, this is not such a case. No amount of predeprivation process would have made [defendant's] alleged behavior toward [plaintiff] palatable.  Post-deprivation remedies are a constitutionally acceptable substitute for predeprivation remedies in many procedural due process cases, but they cannot substitute for something that was itself a substantive constitutional tort.").

judgment brief, and plaintiffs failed to respond to it.  MRVSEC SJ Mem. at 25; MRVSEC Reply

Mem. Supp. Mot. S.J. at 5 [Docket No. 168].

Instead, plaintiffs argued that defendants' conduct was so conscience-shocking that it

violated the Fourteenth Amendment.  Pl. MRVSEC SJ Opp. at 10.  Even if plaintiffs were

correct, though, this would not change the fact that their claim arises under the Fourth

Amendment and cannot be brought under the Fourteenth Amendment.  More importantly,

though, plaintiffs are not correct, as defendants' conduct was not conscience-shocking.

To prevail on a substantive due-process claim, a plaintiff must show both that the

challenged action violated a fundamental constitutional right *and* that the action "shocks the

conscience."  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *see also Flowers v. City*

*of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007) (citing *County of Sacramento*).  The shocks-

the-conscience test is, by its nature, imprecise.  *See County of Sacramento*, 523 U.S. at 847

("[T]he measure of what is conscience-shocking is no calibrated yard stick . . . .").  The test

"points clearly away from liability, or clearly toward it, only at the ends of the tort law's

spectrum of culpability."  *Id.* at 848.  Mere negligence will never give rise to a substantive due-

process violation.  *See Daniels v. Williams*, 474 U.S. 327, 328 (1986); *O'Connor v. Pierson*, 426

F.3d 187, 203 (2d Cir. 2005).

The Court has already found that the individual defendants are entitled to qualified

immunity because the challenged searches were not objectively unreasonable in light of clearly

established legal principles.  For similar reasons, the Court finds that defendants' actions were

not conscience-shocking.  There is no evidence that any defendant intended to harm plaintiffs.

To the contrary, the evidence is clear that defendants believed that the challenged search policy

-43-

was in the best interests of plaintiffs and the other students enrolled in MRVSEC programs.

Misguided but well-intentioned actions like those of defendants in this case may have violated

plaintiffs' Fourth Amendment rights, but those actions come nowhere close to shocking the

conscience.

### D.  Anti-Discrimination Laws

#### 1.  The Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment forbids a state to "deny to any

person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

Under the Clause, a state must generally treat similarly situated persons alike.  *Creason v. City of*

*Washington*, 435 F.3d 820, 823 (8th Cir. 2006).  Conversely, a state is *not* required to treat

*differently* situated persons alike, as long as the state provides an adequate justification for

treating one group of persons differently from another.

MRVSEC admits that it searches the students enrolled in its programs because they are

disabled; in other words, MRVSEC admits that, were its students not disabled, it would not

search them.  Disability is not a suspect classification, however, and thus government policies

that treat disabled persons differently from non-disabled persons are not subject to strict scrutiny,

but only to rational-basis review.  *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356,

366-67 (2001).  Under rational-basis review, "if there is a rational relationship between the

disparity of treatment and some legitimate governmental purpose," then the challenged policy

does not violate the Equal Protection Clause.  *Heller v. Doe*, 509 U.S. 312, 320 (1993); *see also*

*Garrett*, 531 U.S. at 367.

Both Shakopee and MRVSEC contend that the challenged search policy is supported by a rational basis: the need to provide MRVSEC students with a safe, distraction-free environment.[29] The Court agrees.

As discussed above, the Court finds that the challenged search policy is unreasonable under the Fourth Amendment. But to say that a policy is unreasonable is very different from saying that the policy is irrational. Under *Doe*, intrusive school searches like the ones challenged by plaintiffs must be supported by "unique circumstances that would justify significant intrusions" on students' privacy interests. 380 F.3d at 357. This is a much higher standard than the Equal Protection Clause's requirement that a "rational relationship" exist between the challenged practice and the asserted government interest.

Providing to students with special needs an environment that is safer and freer from distractions than the environment provided to students without special needs is plainly a legitimate government interest. Just as plainly, that interest is rationally advanced by a policy of routinely searching students for dangerous and distracting items. That MRVSEC's search policy is overly intrusive makes it unconstitutional under the Fourth Amendment; it does not, however,

---

[29]MRVSEC Reply Mem. Supp. Mot. S.J. at 7 ("MRVSEC undertook the searches to further the legitimate government purpose of providing better special educational services to its unique student population. Further, the searches were rationally related to the goal of removal of distracting and dangerous items.") (citation omitted); Shakopee SJ Mem. at 32 ("[Shakopee's] referrals of Plaintiffs to MRVSEC programs furthers it[s] legitimate interest in meeting its obligation to provide [free appropriate public education] to Plaintiffs and is rationally related to that interest. In addition, MRVSEC's implementation of administrative searches furthers its legitimate interest in maintaining a safe environment and is rationally related to that interest.").

make the search policy irrational.  The Court therefore grants summary judgment to defendants

on plaintiffs' equal-protection claims.[30]

2.  The Rehabilitation Act, the ADA, and the MHRA

Plaintiffs bring federal claims under the ADA and the Rehabilitation Act and state-law

claims under the MHRA.  All of these laws contain similar prohibitions on disability

discrimination.

Title II of the ADA applies to public entities such as Shakopee and MRVSEC.  *See*

*generally* 42 U.S.C. §§ 12131-65.  The section of Title II relevant to this case provides that "no

qualified individual with a disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or activities of a public entity,

or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

Like the ADA, the Rehabilitation Act prohibits disability discrimination, but the

Rehabilitation Act, unlike the ADA, applies only to recipients of federal funding (such as

MRVSEC and Shakopee).  The prohibition on discrimination is found in what is known as § 504

of the Rehabilitation Act, which provides:  "No otherwise qualified individual with a disability

. . . shall, solely by reason of her or his disability, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance . . . ."  29 U.S.C. § 794(a).

Like the ADA and the Rehabilitation Act, the MHRA prohibits disability discrimination.

Minn. Stat. § 363A.12 subd. 1.  The relevant portion of the MHRA provides:

---

[30]The Court notes that, even if MRVSEC had violated plaintiffs' equal-protection rights, Shakopee would not be liable under *Monell* for those violations for the reasons given above in connection with plaintiffs' Fourth Amendment claims.

> It is an unfair discriminatory practice to discriminate against any person in the access to, admission to, full utilization of or benefit from any public service because of . . . disability . . . or to fail to ensure physical and program access for disabled persons unless the public service can demonstrate that providing the access would impose an undue hardship on its operation.

*Id.*

The ADA and the Rehabilitation Act provide similar protections to disabled individuals, as courts have often noted. *See, e.g.*, *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338, 345 (8th Cir. 2006) ("The Rehabilitation Act and Title I of the ADA are interchangeable in many respects."); *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998) ("The rights, procedures, and enforcement remedies under Title II [of the ADA] are the same as under section 504 [of the Rehabilitation Act]."). And the Eighth Circuit has observed, as has this Court, that the MHRA provides essentially the same protections as the ADA. *Somers v. City of Minneapolis*, 245 F.3d 782, 788 (8th Cir. 2001) ("Claims under the MHRA are analyzed the same as claims under the ADA."); *Breiland v. Advance Circuits, Inc.*, 976 F. Supp. 858, 864 (D. Minn. 1997). The Court will therefore generally not distinguish among these three statutes in discussing plaintiffs' claims.

MRVSEC and Shakopee contend that because plaintiffs allege disability discrimination in connection with educational services, plaintiffs must establish that MRVSEC and Shakopee acted in bad faith or with gross misjudgment. Shakopee SJ Mem. at 27; MRVSEC SJ Mem. at 33. But this Court held in *AP v. Anoka-Hennepin Indep. School Dist. No. 11* that bad faith or gross misjudgment is an element of a disability-discrimination claim only in the context of "substantive challenges to a disabled child's individualized education plan." 538 F. Supp. 2d 1125, 1145 (D. Minn. 2008). In cases not involving challenges to educational services, a

showing of deliberate indifference on the defendant's part is "necessary — and sufficient — to recover compensatory damages under the ADA or § 504 . . . ." *Id.* at 1146.

The searches challenged in this case were not themselves part of an educational program. Although MRVSEC and Shakopee have defended the searches by arguing that they were necessary to maintain a good learning environment, many non-education-related things — such as lights and heat — are also essential to maintaining a school's learning environment. For example, many schools use metal detectors to keep weapons out of schools, but that does not make the use of metal detectors part of any student's educational program. Because the challenged searches were not part of the educational services provided by MRVSEC or Shakopee, plaintiffs' disability-discrimination claims require only a showing of deliberate indifference on defendants' part.

Deliberate indifference is a lesser degree of culpable intent than bad faith or gross misjudgment, but it is still a "stringent standard of fault . . . ." *Board of Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "A showing of simple or even heightened negligence will not suffice" to establish deliberate indifference. *Id.* at 407. Rather, a defendant is deliberately indifferent only if he acts with "conscious disregard" for a plaintiff's rights. *Id.* Such conscious disregard exists only if either (1) the defendant actually knows that its actions will violate the plaintiff's rights or (2) such a violation is the "plainly obvious consequence" of the defendant's actions. *Id.* at 410, 412; *see also Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 291 (1998) (citing *Brown*); *AP*, 538 F. Supp. 2d at 1146-47.

There is no evidence that any defendant knew that its actions would violate plaintiffs' rights. Further, no reasonable jury could find that a violation of plaintiffs' rights was a plainly

obvious consequence of the challenged search policy.  The Court assumes, without deciding, that

deliberate indifference toward a violation of plaintiffs' Fourth Amendment rights could support a

disability-discrimination claim.  But as discussed above in connection with qualified immunity,

the challenged searches were not objectively unreasonable in light of clearly established legal

principles.  It follows that defendants were not deliberately indifferent to plaintiffs' Fourth

Amendment rights, and therefore plaintiffs' discrimination claims under the ADA, § 504, and the

MHRA must fail.

Likewise, no reasonable jury could find that defendants were deliberately indifferent to

plaintiffs' rights under the ADA, § 504, or the MHRA.  There is no evidence that plaintiffs were,

on account of their disabilities, excluded from participating in or denied the benefits of any

MRVSEC program.  *See* Shakopee SJ Mem. at 25; MRVSEC SJ Mem. at 29-30.  Although

plaintiffs say that defendants' "pattern and practice" of violating their constitutional rights "is an

outright denial of the benefits of the program," saying this does not make it so.  Pl. Shakopee SJ

Opp. at 26; Pl. MRVSEC SJ Opp. at 24.  Plaintiffs were permitted to attend MRVSEC's

programs; they were simply searched at the beginning of every day as a condition of such

attendance.  The searches themselves did not cause any plaintiff to "be excluded from

participation in or be denied the benefits of the services, programs, or activities of a public

entity . . . ."  42 U.S.C. § 12132.  And even if the searches amounted to disability discrimination

and thereby violated plaintiffs' rights under the ADA, § 504, or the MHRA, no reasonable jury

could find that such a violation was a "plainly obvious consequence" of the searches.  *See*

*Brown*, 520 U.S. at 412.

The Court also notes that plaintiffs' disability-discrimination claims fail for other reasons. With respect to Shakopee, plaintiffs have not provided any basis for holding Shakopee liable for searches conducted at MRVSEC programs. Indeed, in responding to Shakopee's contention that it is not liable for MRVSEC's actions, plaintiffs simply said that "the deliberate indifference . . . and the violations of rights of its resident students referred to the MRVSEC programs results in significant culpability" on Shakopee's part. Pl. Shakopee SJ Opp. at 27-28. But this is a conclusion, not an argument. Plaintiffs have provided no legal basis for holding Shakopee liable under the anti-discrimination laws for the actions of MRVSEC.

With respect to the individual defendants, neither the ADA nor § 504 permits suits against individuals. *See* 42 U.S.C. §§ 12131(1), 12132; *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc) (noting that the ADA does not permit suits against individuals); *Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002) (per curiam) (holding that individuals who do not receive federal financial aid are not subject to suit under § 504). And while none of the parties has briefed this question, the Court doubts that the MHRA permits such suits. *See* Minn. Stat. § 363A.12 subd. 1 ("It is an unfair discriminatory practice . . . to fail to ensure physical and program access for disabled persons unless *the public service* can demonstrate that providing the access would impose an undue hardship on its operation.") (emphasis added). In any event, the Court need not decide whether individuals can be sued for disability discrimination under the MHRA because plaintiffs' MHRA claims fail for the reasons described above.

*E.  Intrusion Upon Seclusion*

Plaintiffs bring a claim under Minnesota law for intrusion upon seclusion — a type of invasion of privacy.  Plaintiffs concede that there is no basis for asserting such a claim against Shakopee or McKay, and the Court therefore grants summary judgment to Shakopee and McKay on this claim.  Pl. Shakopee SJ Opp. at 32.  But plaintiffs continue to assert an intrusion-upon-seclusion claim against MRVSEC and the MRVSEC-associated individual defendants.  Pl. MRVSEC SJ Opp. at 25-26.

Under Minnesota law, a defendant commits the tort of intrusion upon seclusion when she commits "(a) an intrusion; (b) that is highly offensive; . . . (c) into some matter in which a person has a legitimate expectation of privacy."  *Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741, 744 (Minn. Ct. App. 2001).  With respect to the second element — offensiveness — the plaintiff must establish that "'the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable [person], as the result of conduct to which the reasonable [person] would strongly object.'"  *Id.* (quoting Restatement (Second) of Torts § 652(b) cmt. d (1977); alterations in *Swarthout*).

There is no dispute that the challenged searches intruded into a matter in which plaintiffs had a legitimate expectation of privacy.  The key question, then, is whether a reasonable jury could find that the searches were so "highly offensive" that a reasonable person "would strongly object" to them.  *Swarthout* held, in reversing a grant of summary judgment to a defendant on an intrusion-on-seclusion claim, that whether a challenged action would be highly offensive to a reasonable person is ordinarily a question of fact.  632 N.W.2d at 745; *see also Hougum v. Valley Mem. Homes*, 574 N.W.2d 812, 818 (N.D. 1998) ("Issues about intent and the reasonable person

-51-

standard are ordinarily questions of fact, but they become questions of law if reasonable persons

can draw only one conclusion from the evidence.") (citation omitted).

The Court concludes that whether MRVSEC's searches would have been highly offensive

to a reasonable person is a question of fact for the jury.  On the one hand, the lack of

offensiveness of the searches is shown by the fact that numerous students were subjected to the

searches every day for years and few of them or their parents ever complained.  On the other

hand, there are many reasons why a disabled student or her parents might not complain about the

challenged searches; the fact that they did not complain does not mean that they did not find the

searches offensive.  Moreover, as described at length above, the searches were highly intrusive.

On this record, the Court declines to substitute its assessment of the offensiveness of the searches

for that of a jury.

The intrusion-upon-seclusion claims of three plaintiffs — Tristan, Emily, and David —

must nevertheless be dismissed, because those claims are time-barred.  Under Minnesota law, the

tort of intrusion on seclusion is subject to the two-year statute of limitations for "tort[s] resulting

in personal injury" established in § 541.07 of the Minnesota Statutes.  *See Manion v. Nagin*,

Nos. 00-238 & 02-370, 2003 WL 21459680, at *8 (D. Minn. June 20, 2003).  MRVSEC

contends that Tristan, Emily, and David all stopped attending MRVSEC programs more than two

years before this lawsuit was filed.  MRVSEC SJ Mem. at 39.  Plaintiffs do not dispute this;

indeed, plaintiffs did not respond at all to MRVSEC's statute-of-limitations argument.  *See* Pl.

MRVSEC SJ Opp. at 25-26.  Accordingly, because the claims of Tristan, Emily, and David all

arose more than two years before this suit was filed, the Court grants summary judgment to

MRVSEC and the MRVSEC-associated individual defendants on the intrusion-upon-seclusion claims of these three plaintiffs.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1.      The motion of plaintiffs for summary judgment [Docket No. 126] is GRANTED IN PART and DENIED IN PART as follows:

     a.      With respect to plaintiffs' claims against defendant Minnesota River Valley Special Education Cooperative under 42 U.S.C. § 1983 for violation of the Fourth Amendment as pleaded in Count 1 of plaintiffs' second amended complaint, plaintiffs' motion is GRANTED.

     b.      Plaintiffs' motion is DENIED in all other respects.

2.      The motion of defendants Shakopee Public Schools, Shakopee Board of Education, and Kathy McKay for summary judgment [Docket No. 118] is GRANTED.

3.      The motion of defendants Minnesota River Valley Special Education Cooperative, Lezlie Prettyman Olson, Darren Kermes, Colleen Trosen, and Barbara Bahnson ("the MRVSEC defendants") for summary judgment [Docket No. 121] is GRANTED IN PART and DENIED IN PART as follows:

     a.      With respect to plaintiffs' claims against defendant Minnesota River Valley Special Education Cooperative under 42 U.S.C. § 1983 for violation of the Fourth Amendment as pleaded in Count 1 of plaintiffs'

second amended complaint, the MRVSEC defendants' motion is

DENIED.

b.      With respect to plaintiffs' claims against defendants Lezlie Prettyman

Olson, Darren Kermes, Colleen Trosen, and Barbara Bahnson under 42

U.S.C. § 1983 for violation of the Fourth Amendment as pleaded in

Count 1 of plaintiffs' second amended complaint, the MRVSEC

defendants' motion is GRANTED.

c.      With respect to plaintiffs' claims under 42 U.S.C. § 1983 for violation of

the Fourteenth Amendment's due-process and equal-protection clauses as

pleaded in Counts 1 and 2 of plaintiffs' second amended complaint, the

MRVSEC defendants' motion is GRANTED.

d.      With respect to plaintiffs' claims under the Minnesota Constitution as

pleaded in Count 2 of plaintiffs' second amended complaint, the

MRVSEC defendants' motion is GRANTED.

e.      With respect to plaintiffs' freestanding claims under 42 U.S.C. § 1983 as

pleaded in Count 3 of plaintiffs' second amended complaint, the

MRVSEC defendants' motion is GRANTED.

f.      With respect to plaintiffs' claims under § 504 of the Rehabilitation Act, 29

U.S.C. § 794, as pleaded in Count 4 of plaintiffs' second amended

complaint, the MRVSEC defendants' motion is GRANTED.

g.      With respect to plaintiffs' claims under the Americans with Disabilities Act as pleaded in Count 5 of plaintiffs' second amended complaint, the MRVSEC defendants' motion is GRANTED.

h.      With respect to plaintiffs' claims under the Minnesota Human Rights Act as pleaded in Count 6 of plaintiffs' second amended complaint, the MRVSEC defendants' motion is GRANTED.

i.      With respect to the claims of plaintiffs Tristan Hough, Emily Troseth, and David Moravec for intrusion upon seclusion as pleaded in Count 7 of plaintiffs' second amended complaint, the MRVSEC defendants' motion is GRANTED.

j.      With respect to the claims of plaintiffs Trevin Hough and Daniel Manthey for intrusion upon seclusion as pleaded in Count 7 of plaintiffs' second amended complaint, the MRVSEC defendants' motion is DENIED.

4.      Accordingly:

a.      All of plaintiffs' claims against defendants Shakopee Public Schools, Shakopee Board of Education, and Kathy McKay are DISMISSED WITH PREJUDICE AND ON THE MERITS.

b.      The Court DECLARES that defendant Minnesota River Valley Special Education Cooperative violated plaintiffs' right under the Fourth Amendment to be free of unreasonable searches and seizures when it conducted the challenged searches.

c.     With respect to defendants Lezlie Prettyman Olson, Darren Kermes, Colleen Trosen, and Barbara Bahnson, all of plaintiffs' claims pleaded in Count 1 are DISMISSED WITH PREJUDICE AND ON THE MERITS.

d.     With respect to defendant Minnesota River Valley Special Education Cooperative, to the extent that Count 1 raises claims under the Fourteenth Amendment, those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

e.     With respect to defendants Minnesota River Valley Special Education Cooperative, Lezlie Prettyman Olson, Darren Kermes, Colleen Trosen, and Barbara Bahnson:

    i.     Count 2 for violations of the Fourteenth Amendment and of the Minnesota Constitution is DISMISSED WITH PREJUDICE AND ON THE MERITS.

    ii.     To the extent that Count 3 raises freestanding claims under 42 U.S.C. § 1983, Count 3 is DISMISSED WITH PREJUDICE AND ON THE MERITS.

    iii.     Count 4 for violations of § 504 of the Rehabilitation Act, 29 U.S.C. § 794, is DISMISSED WITH PREJUDICE AND ON THE MERITS.

    iv.     Count 5 for violations of the Americans with Disabilities Act is DISMISSED WITH PREJUDICE AND ON THE MERITS.

v.      Count 6 for violations of the Minnesota Human Rights Act is

DISMISSED WITH PREJUDICE AND ON THE MERITS.

vi.      The claims of plaintiffs Tristan Hough, Emily Troseth, and David

Moravec for intrusion upon seclusion as pleaded in Count 7 are

DISMISSED WITH PREJUDICE AND ON THE MERITS.

5.      The Shakopee defendants' motion for a separate trial [Docket No. 161] is

DENIED AS MOOT.


Dated:  March 30, 2009                    s/Patrick J. Schiltz
                                           Patrick J. Schiltz
                                           United States District Judge